847 A.2d 1206

**Junior Martin WONG–WING**

**v.**

**STATE of Maryland.**

**No. 2255, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

April 29, 2004.

598

Adina N. Amith (Stephen E. Harris, Public Defender on the brief), Baltimore for appellant.

Annabelle L. Lisic, Michelle W. Cole (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before HOLLANDER, KRAUSER, GREENE,* JJ.

HOLLANDER, Judge.

Junior Wong–Wing, appellant, was convicted by a jury sitting in the Circuit Court for Baltimore City of second degree sexual offense, two counts of third degree sexual offense, two counts of child sexual abuse, and five counts of second degree assault.[1] He was sentenced to a total term of imprisonment of ten years.

---

* Greene, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; and participated in the adoption of this opinion as a member of this Court by special designation.

1. This case involves several indictments that were consolidated for trial. In his brief, appellant states that he was convicted, *inter alia*, of

Appellant presents two questions for our review, which we have reworded slightly:

I.   Did the trial court commit plain error when it allowed the State to admit into evidence a recording and transcript of an allegedly confidential communication between appellant and his wife?

II.   Did the trial court err in failing to allow appellant to offer testimony on statements made by his wife in order to establish her bias against appellant, as well as statements made by his aunt to show that appellant acted in accordance with those statements?

Finding no error, we shall affirm.

## FACTUAL SUMMARY

Appellant married Sherri Frazier in 1996. Frazier has a daughter, Christina M., who was born on May 24, 1988; she was thirteen years of age at the time of trial. During the marriage, appellant, Frazier, and Christina lived with Frazier's mother, Shirley Griffin, on Edison Highway in Baltimore City. Appellant and Frazier separated in February 1998, attempted a reconciliation in April 2000, and then divorced in June 2001. During the separation, appellant rented an apartment on Harford Road. However, he continued to have contact with Christina, because he sometimes cared for her on the weekends.

Christina testified that appellant took care of her before and after the separation. Further, Christina stated that after appellant and her mother separated, she sometimes went to appellant's apartment on Harford Road, and he sometimes visited her at her house on Edison Highway.

According to Christina, when she was about ten years old, appellant began watching pornographic videotapes with her and touching her sexually. She claimed that appellant last touched her sexually when she was eleven years old.

---

attempted second degree rape. The verdict sheet reflects, however, that appellant was found "not guilty" of that offense.

Christina stated that the sexual incidents occurred between April 1999 and April 2000.

In her testimony, Christina said: "[Appellant] touched me on my vagina, my breasts, and that's it." She also claimed that appellant "would lick my vagina, he would lick my breasts, and I would tell him to stop, and he would just keep on going." Christina recalled that, on some occasions, appellant's conduct was painful. Christina added that appellant "rubbed his penis against [her] vagina," ejaculated, removed his pants, and had her "touch him on his penis" and "stroke his penis."

Christina was asked if appellant ever said anything to her about informing anyone as to what he was doing. She responded: "He would say that if you told anybody, then he would be in trouble, and that I would get in trouble, and that it would mess his life up, and he would go to jail, and all this other stuff."

Despite appellant's admonition, on April 24, 2000, Christina told her grandmother, Shirley Griffin, what had occurred. The next morning, Griffin told Frazier what she had learned from Christina, and Frazier notified the police. In her testimony, Frazier recalled that she contacted appellant at his place of work. Recalling the conversation, Frazier said: "I told him that I was aware of what had occurred. And he denied it. And he also said that he knew what he did, but what about what my daughter did to him." Appellant also told Frazier that he did not want to live and that he had wanted to tell Frazier about it but he did not know how.

During a subsequent telephone conversation, appellant informed Frazier that he had tried to kill himself with an overdose of pills. Frazier told appellant that he should turn himself in, but appellant stated that he wanted to speak to his aunt first.

In addition, Frazier testified that, on April 27, 2000, she returned home from work to find a message on her telephone answering machine from appellant. Frazier contacted Detective Ethan Newberg, a member of the child abuse unit of the

Baltimore City Police Department who had been assigned to the case. He listened to the message and made a recording of it. The tape recording was played for the jury, and a transcript of the recording was admitted into evidence. The transcript provides:

> Sherry [sic] I know (inaudible) I don't (inaudible) think they're wrong, so (inaudible)[.] At this point, I don't want to hear anything that happened before but I just want to say that (inaudible) cause a lot of pain and grief.
>
> (beep)
>
> Sherry, I just want to say good bye again. Sorry for all the pain and grief I caused in your life. I mean its [sic] too late to say that now, but, anyway, I ain't feel like living anymore. I caused too much (inaudible) you know. (Inaudible) I wish I could die and I'm sorry. Ok, bye bye.
>
> (beep)
>
> Sherry, there's some money in (inaudible) suitcase in the apartment (inaudible) anything happens to me (inaudible)[.]

Detective Newberg testified that on April 27, 2000, he obtained a warrant to search appellant's apartment. When he arrived at the apartment, appellant was gone.

The evidence also showed that, on or about May 1, 2000, appellant terminated the lease on his apartment, leaving behind his furniture and the return of his security deposit, in the amount of $299.04. In appellant's written notice to his landlord, he indicated that his mother was ill. A week later, on May 8, 2000, appellant was arrested in Highland Park, New Jersey. He had in his possession a cashier's check for $10,000 and $2,350 in cash.

In the defense case, appellant's aunt, Michelle Thomas, testified that she lived in Highland Park, New Jersey. On or about April 28, 2000, Thomas called the Edison Highway residence in order to inform appellant that his mother, who lived in Trinidad, had suffered a stroke. At that time, Thomas spoke with Frazier, who told her of the accusations against appellant. Thomas eventually called appellant at his Harford Road apartment and suggested that he come live with her

because he had kidney problems and she would care for him. Appellant went to stay with Thomas on May 1, 2000, and she suggested that he visit his mother. Thomas then made the arrangements for appellant's trip to Trinidad, and purchased a round trip ticket for him.

Appellant testified that he suffered from kidney problems and from sexual impotency. His hospital records were introduced in evidence to support his claims. Further, appellant explained that he had planned to travel to Trinidad to visit his mother and that the money he had in his possession at the time of his arrest was to pay for her care. He denied abusing Christina or touching her in an inappropriate manner.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant claims that the trial court erred in admitting the transcript of the message he left on Frazier's answering machine, because it was "intended solely for his wife." He asserts that the message constituted a confidential spousal communication protected by Maryland Code (1974, 2002 Repl. Vol.), § 9–105 of the Courts and Judicial Proceedings Article ("C.J."). In his view, the court's ruling "flies in the face of important public policy [codified in the statute] and requires reversal."

■ While recognizing that defense counsel objected to the admission of the message, appellant concedes that his lawyer did not invoke the marital communication privilege. Rather, defense counsel argued that the tape had not been timely disclosed; the recording did not indicate the date that it was made; and it was not relevant.[2] The following colloquy at trial is pertinent:

---

2. The matter was also raised at a pre-trial hearing to exclude the tape. There, appellant argued that the recording lacked any "guarantee of

[DEFENSE COUNSEL]: We had an objection to this tape. You said you were going to, I believe, reserve your ruling on this.

THE COURT: What was your objection?

[DEFENSE COUNSEL]: The objection was several-fold. One, this tape was only turned over . . .

\* \* \*

THE COURT: All right. Well, beside the date issue, the time and date, what other position do you have?

[DEFENSE COUNSEL]: Just the relevancy of that. That's a great leap of faith on the State's part to say, well, this is what it shows.

THE COURT: Okay. It's up to the jury. I'll put it in.

[PROSECUTOR]: Your Honor, my other question goes to whether or not I'm going to admit this part and parcel of the tape, the transcription which counsel (inaudible).

THE COURT: What's your reaction to that?

[DEFENSE COUNSEL]: I'd really rather not.

[PROSECUTOR]: It's very difficult (inaudible).

[DEFENSE COUNSEL]: Well, I take it my objection to the tape is overruled.

THE COURT: Yes, it is.

[DEFENSE COUNSEL]: Okay. You can barely hear the tape itself and I have a problem with it coming in but, I understand your ruling on it. If I'm going to have to swallow . . .

THE COURT: Excuse me. We're beyond that. This is the issue of the transcript.

[DEFENSE COUNSEL]: Then I would submit the transcript rather than the tape.

THE COURT: So, you want the transcript?

---

trustworthiness of when it was made or, in fact, if there was any tampering of it."

[DEFENSE COUNSEL]: I don't want the transcript in. I really don't want anything to do with that. But, I understand your ruling. Your Honor. But, if I have to swallow the poison, I'd swallow it in this direction.

THE COURT: You can have the transcript come in.

[DEFENSE COUNSEL]: Yes. But, you understand, I object to it.

THE COURT: I want you to preserve your objection. All right.

Later, during Frazier's testimony, the tape recording and the transcript of appellant's phone message were admitted in evidence. Defense counsel renewed his objection, and the court granted defense counsel a continuing objection on the grounds previously raised.

■ We conclude that appellant failed to preserve the spousal privilege question for our review; despite articulating several grounds to support his objection, appellant never asserted the statutory spousal communication privilege. "First and foremost among the things that one claiming a privilege must do is actually to assert the privilege." *Ashford v. State*, 147 Md.App. 1, 65, 807 A.2d 732, *cert. denied*, 372 Md. 430, 813 A.2d 257 (2002). *See also Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999) ("It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal."); *Thomas v. State*, 104 Md.App. 461, 465, 656 A.2d 799 (1995)(where party asserts specific grounds for an objection, all other grounds not specified are waived); Maryland Rule 8–131(a).

■ In the alternative, appellant urges us to review the matter under the plain error doctrine. We need not address the question of whether to consider the issue under the plain error doctrine, as we discern no error in the admission of the recording and transcript. We explain.

C.J. § 9–105 is one of two privileges that protects confidential communications between husband and wife. *Ashford,* 147 Md.App. at 59, 807 A.2d 732; *see also Brown v. State,* 359 Md. 180, 753 A.2d 84 (2000).[3] C.J. § 9–105 provides: "One spouse is not competent to disclose any *confidential* communication between the spouses occurring during their marriage." (Emphasis added). As Judge Moylan explained for this Court in *Ashford,* the spousal privilege embodied in C.J. § 9–105 is available in both civil and criminal trials, and "may be asserted by the spouse who uttered the confidential communication." *Ashford,* 147 Md.App. at 59, 807 A.2d 732; *see also* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3rd ed.1999), § 903, at 374–378; Lynn McLain, *Maryland Evidence* (2001), § 505:2, at 152–155.

"Communications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Coleman v. State,* 281 Md. 538, 542, 380 A.2d 49 (1977) (citation omitted). In *State v. Enriquez,* 327 Md. 365, 372, 609 A.2d 343 (1992), the Court said that "there is a rebuttable presumption that marital communications are confidential and privileged." *See State v. Mazzone,* 336 Md. 379, 384, 648 A.2d 978 (1994). But, that "presumption is rebutted ... where it is shown that the communication was not intended to be confidential." *Enriquez,* 327 Md. at 372, 609 A.2d 343 (citation omitted). Moreover, appellant had the burden of establishing "the element of confidentiality...." *Ashford,* 147 Md.App. at 69, 807 A.2d 732.

When "the communication is made with the contemplation or expectation that a third party will learn of it, the

---

**3.** The other spousal privilege is codified in C.J. § 9–106. In general, it "protects the sanctity of a marital relationship by giving the criminal defendant's spouse a right to refuse to testify as a State's witness." Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3rd ed.1999), § 903, at 375. C.J. § 9–106 is not in issue here.

confidential communication privilege does not apply." *Mat-thews v. State,* 89 Md.App. 488, 502, 598 A.2d 813 (1991) (citation omitted). For example, in *Coleman,* 281 Md. at 543, 380 A.2d 49, the Court explained that "the fact that a husband knew that his wife was unable to read without the assistance of a third party would rebut the presumption that a letter which he sent to her was intended to be confidential. Similarly, ... a husband's communication to his wife to discuss a matter with certain other individuals was held not confidential." (Citations omitted). *See also Gutridge v. State,* 236 Md. 514, 516, 204 A.2d 557 (1964) (concluding that "message sought to be sent to the appellant's wife through another cannot be regarded as confidential"); *Master v. Master,* 223 Md. 618, 623, 166 A.2d 251 (1960) (finding that conversation between husband and wife was not confidential because it took place in the presence of children old enough to understand what was being said); *Cf. Miles v. State,* 365 Md. 488, 514 & n. 9, 781 A.2d 787 (2001) (suppressing, under wiretap statute, cellular telephone conversations between husband and wife, intercepted by a private citizen and turned over to the police, but noting that, even without that statute, the conversations would have been suppressed as privileged marital communications), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002).

We have not uncovered a Maryland case that is directly on point. However, *United States v. Meriwether,* 917 F.2d 955 (6th Cir.1990), is illuminating. There, the defendant was convicted of a felony drug offense. He was implicated when DEA agents executed a search warrant at a drug dealer's residence and recovered "an electronic digital display-type pager capable of receiving and storing messages from a touch-tone telephone." *Id.* at 957. The defendant's phone number was recovered from the pager, and he sought to suppress that evidence. Claiming that he had a reasonable expectation of privacy in the "transmitted phone number" recorded on the pager device, the defendant argued that his Fourth Amendment rights were violated by the seizure. *Id.* at 958.

The Sixth Circuit assumed, *arguendo*, that the warrant did not authorize the seizure of appellant's phone number. Nevertheless, it was satisfied that the defendant did not assert a valid Fourth Amendment claim, because he did not have a reasonable expectation of privacy "when he transmitted his number to the pager." *Id.* The court observed that the defendant failed to establish that he sought to preserve the "message as private," since he transmitted it "into a paging receiver over which he has no control." *Id.* at 959. The court said: "When one transmits a message to a pager, he runs the risk that the message will be received by whomever is in possession of the pager." *Id.*

In the Sixth Circuit's view, a person who transmits a message to a pager "has no external indicia that the message actually is received by the intended recipient." *Id.* According to that court, when the defendant sends a message to a pager, he "runs the risk that either the owner or someone in possession of the pager will disclose the contents of his message." *Id.* The court concluded: "Since the actual confidentiality of a message to a pager is quite uncertain, we decline to protect appellant's misplaced trust that the message actually would reach the intended recipient." *Id. See also United States v. Passarella,* 788 F.2d 377, 380 (6th Cir.1986) (holding that when a telephone caller mistakenly believes he is speaking with a particular person, the Fourth Amendment does not protect a wrongdoer's misplaced trust that a telephone communication will actually be received by the person for whom it is intended); *United States v. Whitten,* 706 F.2d 1000, 1010–1011 (9th Cir.1983) (finding no reasonable expectation of privacy in regard to the contents of a communication recorded on a telephone answering machine that broadcasts aloud), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

In this case, appellant left a message for Frazier on an answering machine in a home that he knew Frazier shared with her adolescent daughter and her mother. Although there was evidence presented that the home was set up as two apartments, the testimony also indicated that the family members moved freely between the two living spaces. Because the

privilege issue was not raised below, there was no evidence presented regarding the location of the answering machine; who had access to it; or whether the answering machine was the kind that broadcast aloud any message that it recorded.

In any event, the facts did not support appellant's claim that appellant left the message with the intention that it would be confidential. Simply put, when appellant left the message on the answering machine, he ran the risk that someone other than Frazier would retrieve the message. Under the circumstances, appellant had no reasonable expectation of confidentiality, nor was it shown that the communication was confidential in nature.[4] Therefore, the admission of the message did not violate C.J. § 9–105.

## II.

■ Appellant next claims that the trial court erred in limiting his testimony in regard to statements made by Frazier that he claims were relevant to show her bias against appellant. He also complains about the court's failure to admit statements made by Thomas, appellant's aunt. In his view, the evidence fell within an exception to the hearsay rule.

■ Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801. As a general rule, hearsay is not admissible at trial. Md. Rule 5–802. "A hearsay statement may be admissible, however, under an exception to the hearsay rule because circumstances provide the 'requisite indicia of trustworthiness concerning the truthfulness of the statement.'" *State v. Harrell*, 348 Md. 69, 76, 702 A.2d 723 (1997) (quoting *Ali v. State*, 314 Md. 295, 304–05, 550 A.2d 925 (1988)).

---

4. Even if there were any ambiguity, "[t]he disfavor with which the law looks on testimonial privileges dictates that we resolve an ambiguity against the privilege, rather than in its favor." *Ashford*, 147 Md.App. at 70, 807 A.2d 732.

The exception upon which appellant relies is set forth in Maryland Rule 5–803(b)(3). It states:

(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

We are satisfied that the trial court did not abuse its discretion in failing to allow appellant to testify to statements made by Frazier and Thomas. We explain.

During his direct testimony, appellant stated that, on the evening of October 25, 2000, he had gone to the hospital because his kidney problems flared up. The following exchange occurred:

[DEFENSE COUNSEL]: Did you make any calls to your wife from the hospital?

[APPELLANT]: Yes, sir.

[DEFENSE COUNSEL]: . . . How did you feel both physically and emotionally that day?

[APPELLANT]: Very terrible, sir. It was like a nightmare.

[DEFENSE COUNSEL]: And what was the nightmare for you, Mr. Wong–Wing?

[APPELLANT]: I wasn't feeling well, and my wife called me and told me I had been sexually abusing Christina.

[DEFENSE COUNSEL]: How did you feel toward your wife prior to this?

[APPELLANT]: I loved my wife.

[DEFENSE COUNSEL]: Did you feel that you were in any way the fault of her separating from you because of your problem?

[APPELLANT]: Yes, sir.

[DEFENSE COUNSEL]: Did she ever tell you that her life wasn't—

[PROSECUTOR]: Objection.

THE COURT: Sustained.

Appellant contends that the statements made by Frazier should have been admitted under Md. Rule 5–803(b)(3) as evidence of her then existing emotional state. He claims that Frazier's mental or emotional state was relevant to demonstrate any bias or ill-will she had against him, "and thus a motive to testify falsely against him." Moreover, appellant contends that the issue of Frazier's credibility "was crucial to a determination of [his] guilt." He asserts: "Absent a full and fair opportunity to flush out Appellant's wife's possible motives for testifying falsely, one cannot say that the trial court's error was harmless beyond a reasonable doubt."

Defense counsel's question constituted a broad inquiry. And, because there was no proffer from the defense, we are unable to determine the evidence counsel sought to elicit. *See Mack v. State,* 300 Md. 583, 603, 479 A.2d 1344 (1984) (Generally, "the question of whether the exclusion of evidence is erroneous and constitutes prejudicial error is not properly preserved for appellate review unless there has been a formal proffer of what the contents and relevance of the excluded testimony would have been.") (Citations omitted).

In any event, even if we were to conclude that the evidence of Frazier's statements should have been admitted, we would hold that there was no harm or prejudice to appellant by its exclusion. The marital difficulties between appellant and Frazier were made known to the jury. In addition, on cross-examination, Frazier was questioned in regard to an allegation that she had lied in the divorce proceedings. Indeed, Frazier admitted that she had not been truthful. She also admitted that she had emptied their joint bank account when they separated and that part of the reason for the divorce was appellant's sexual dysfunction. Accordingly, the nature of the relationship between appellant and Frazier was a matter before the jury.

As we noted, appellant also attempted to testify to statements made by Thomas, his aunt, in which she suggested that appellant travel to Trinidad to visit his ailing mother. The following exchange is pertinent:

[DEFENSE COUNSEL]: Do you recall receiving a phone call from your aunt, Michelle Thomas?

[APPELLANT]: Yes, sir.

[DEFENSE COUNSEL]: And you heard us go through the phone records when she called you at approximately 7 o'clock in the morning on April 28th, 2000.

[APPELLANT]: Yes, sir.

[DEFENSE COUNSEL]: Do you recall why she called you that morning?

[APPELLANT]: Yes, sir.

[DEFENSE COUNSEL]: And what was the reason for her call?

[APPELLANT]: To tell me about what has happened.

[DEFENSE COUNSEL]: Did she give you any other news?

[APPELLANT]: Yes, sir. My mother had a stroke.

[DEFENSE COUNSEL]: I see. And what was your physical condition at that time on the 28th?

[APPELLANT]: I was not well, sir. I was feeling sick.

[DEFENSE COUNSEL]: Did your aunt—what did she suggest that you do?

[APPELLANT]: (Inaudible).

[PROSECUTOR]: Objection.

THE COURT: Sustained. It's hearsay.

Appellant contends that Thomas's statements should have been admitted to establish that he "followed his aunt's advice to make arrangements to visit his ailing mother." He asserts: "Appellant needed to tell the jury why he left Maryland. Moreover, the jury was entitled to hear—from Appellant— that his planned trip to Trinidad was at the advice of his aunt and was for an important purpose. The trial court's failure to permit appellant to testify as to his aunt's suggestion, de-

prived him of the right to testify in his own defense and mandates reversal." He adds that his "state of mind was relevant to rebut the inference that Appellant left Maryland to avoid prosecution." In his view, the statements were thus admissible under the state of mind exception of Md. Rule 5–803(b)(3). *See Graves v. State,* 334 Md. 30, 38, 637 A.2d 1197 (1994).

Rule 5–803(b)(3) offers appellant no relief, as the statement must be of the declarant's then existing state of mind, emotion, sensation, or physical condition, offered to prove the declarant's course of action. Here, Thomas was the declarant, and appellant sought the admission of her statement to prove his own future conduct. That use of hearsay testimony is not embodied in the Rule. *See generally Johnson v. State,* 38 Md.App. 306, 314, 381 A.2d 303 (1977) (" '[E]vidence of declarations of a plan, design or intention presently entertained by the declarant is ... admissible when offered as evidence that the design was carried out by acts or omissions of the declarant' ") (citation omitted).

In any event, evidence of the advice appellant received from Thomas came in through Thomas's testimony, in which she stated that she informed appellant that his mother was sick; that he should stay with Thomas so she could care for him; that he should visit his mother; and that she made arrangements for appellant's trip. Furthermore, appellant testified that, as a result of his conversation with Thomas, he went to New Jersey and decided to help care for his mother. Appellant was not harmed by the court's ruling, which limited his testimony in regard to statements made by Thomas.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**