752 A.2d 620

Antwaun BROWN

v.

STATE of Maryland.

No. 1578, Sept. Term, 1998.

Court of Special Appeals of Maryland.

May 31, 2000.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. General, Baltimore, and Jack Johnson, State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before KENNEY, BYRNES and JOHN J. BISHOP, (Ret'd, specially assigned), JJ.

## PROCEEDINGS

KENNEY, J.

Appellant, Antwaun Brown, was arrested on February 28, 1997, and charged with first degree murder and related offenses arising out of the shooting death of an off-duty Washington, D.C. police officer. A hearing on appellant's motion to suppress evidence seized from his vehicle was held on August 21 and 22, 1997, in the Circuit Court for Prince George's County. The trial court denied the motion.

Appellant's first jury trial, in March 1998, resulted in a mistrial. A second jury trial was held on September 28 through October 5, 1998. Appellant was convicted of first degree murder, robbery with a deadly weapon, robbery, unlawful use of a handgun, and two counts of conspiracy to commit robbery. He received a life sentence, without the possibility of parole, for the first-degree murder count.[1] The trial court also imposed a consecutive twenty-year sentence for robbery with a deadly weapon, a consecutive twenty-year sentence for the unlawful use of a handgun, and a third consecutive twenty-year sentence for conspiracy to commit robbery.

Appellant filed a timely notice of appeal and presents two questions, which we have reworded as follows:

---

[1]. The State filed a Notice of Intent to Seek the Death Penalty. At the sentencing hearing, appellant was found ineligible for the death penalty.

I. Did the trial court err in denying appellant's motion to suppress the evidence seized from appellant's 1981 Cadillac automobile?

II. Did the trial court err in denying appellant's motion for a mistrial based on the presence of police spectators at his trial?

## FACTUAL BACKGROUND

In the early morning hours of February 26, 1997, appellant, Donovan Strickland, and Anthony Crawley were at a gas station when they first saw Oliver Smith, an off-duty District of Columbia police officer, arrive in a red car. They proceeded to follow him to a parking lot in his apartment complex located on Rena Road in Forestville, Maryland. Strickland and Crawley exited the vehicle with Strickland carrying a handgun. Appellant remained in the car.

Strickland approached Officer Smith and ordered him to lie on the ground. Officer Smith complied. Crawley then searched Officer Smith, removing a gun, and taking approximately one hundred dollars cash. Upon discovering that Smith was a police officer, Strickland exclaimed "... it's the police." Appellant then exited the car and walked toward the men. Strickland handed appellant the gun, and appellant shot Officer Smith in the head three times. Officer Smith died of his wounds.

Appellant was arrested on February 28, 1997 in Fairfax, Virginia, pursuant to an outstanding warrant. At the time of his arrest, appellant was driving a burgundy Oldsmobile registered in his name. The Oldsmobile was brought back to the Prince George's County police evidence bay where it was searched pursuant to a valid search warrant.

After appellant's arrest, the police discovered that appellant owned a second vehicle, a 1981 "silver gray" Cadillac with the license plate 565 BAH. Prince George's County Police Detective John Piazza went to appellant's home in Landover, Maryland and discovered the Cadillac parked in front of the resi-

dence. He then secured search warrants to search both appellant's home and the Cadillac.[2]

When the police arrived at appellant's home to conduct the searches, they discovered the Cadillac was no longer there. They then began to search appellant's home. During their search, appellant's mother informed them that the Cadillac had been driven to the 800 block of Barnaby Place, in southeast Washington, D.C.

Detective Thomas Lancaster, at the direction of Detective Jeffrey Reichert, located the Cadillac in the District of Columbia and had it towed to the Prince George's County police headquarters evidence bay, where it was searched pursuant to the search warrant. Recovered from the Cadillac's trunk was a blue nylon bag that contained a box of .32 caliber ammunition and a .32 caliber handgun, which was identified later as the murder weapon.

After appellant's arrest, he was questioned by various Prince George's County police officers. Although initially he denied any involvement in the shooting, he later admitted that he shot Officer Smith, asserting it was accidental and that he was intoxicated at the time.

Appellant moved to suppress the evidence seized from the Cadillac, arguing that the police went outside the scope of their authority in retrieving the Cadillac from Washington, D.C. At the August 22, 1997 suppression hearing, defense counsel questioned Detective Reichert as follows concerning the seizure of the Cadillac:

Q. The vehicle was not—the vehicle was seized in the District of Columbia?

A. Yes.

---

2. The application for the search warrant for the Cadillac incorrectly indicated that the Cadillac was located at the "i.d. bay" at police headquarters in Prince George's County, rather than appellant's residence. At the suppression hearing of August 22, 1997, the trial court concluded that this was a "clerical error." Appellant does not dispute this ruling.

Q. Did Mr. Brown give you permission to take his vehicle from D.C. to Maryland?

A. No.

Q. Upon what authority did you take the vehicle from D.C. to Maryland?

A. Under what authority? I don't know what authority I had. I mean, it was my—I believed I had the authority to take the vehicle from the District, to bring it to Maryland to our i.d. bay.

Q. Now, you would agree with me, would you not, that you did not contact the District of Columbia authorities—

A. No. No.

Q. —to assist you or whatever assistance they may be able to render in seizing the car and transporting it to Maryland, did you?

A. That's correct.

The trial court denied appellant's motion to suppress the evidence, stating:

The next question I think is the more important question. That is how do the police go into a foreign jurisdiction, pick up the property without the help of the local government. I think [appellant] hit it on the head. Self help. They're not acting as Prince George's County police officers at the time they're able to as private citizens.

Perhaps the better way to do it is to get the District of Columbia involved. I don't think at this particular time having the search warrant in your hand, that you need the permission of the defendant to bring the vehicle back. I think it would be a bad search if they opened up the trunk when they're in D.C. Southeast and searched, because they're outside the jurisdiction Judge Sothoron's warrant doesn't apply. I think once they got into the car, the car was not towed until they had the search warrant in their hand, since this all occurred in the early morning hours of March 1, 1997. Then they serve it.

I think it is perfectly permissible. Perhaps not the better course of action to take, but not something that will invalidate the search warrant. Therefore, the motion to suppress for the reasons I gave in the factual findings that I made is denied.

During his trial on October 1, 1998, appellant also made a motion to "exclude a sizable portion" of the uniformed police officers present in the courtroom, stating, "our concern is their presence may unfairly influence this jury to convict our client." The trial court denied appellant's motion, stating, "The Court would observe that there are a number of spectators in the courtroom.... But I think this is a public forum and everybody has a right to be here."

Again, at the sentencing hearing on October 8, 1998, appellant moved for a mistrial based on the number of uniformed police officers present in the courtroom, stating:

Secondly, at this juncture, I'm once again compelled to move for a mistrial due to the imposing presence of the police, uniformed police, in the courtroom. I would suggest that their presence—the impact of their presence—is unduly unfavorable, would be unfavorable to the defendant.

He can't gauge what impact. Actually, I can't gauge what impact, the risk of the impact on them, on the deliberations of the jurors.

Again, the trial court stated that this is a "public forum and anybody has a right to be here." Appellant's counsel then, for the record, estimated that thirty or forty police officers were present in the courtroom. The trial court, in response, noted that "over ten" uniformed police officers were present.

## DISCUSSION

### I. Seizure of the Cadillac

In reviewing the trial court's denial of a motion to suppress evidence, this Court looks only at the record of the suppression hearing, and does not consider the record of the trial. *Pappaconstantinou v. State,* 352 Md. 167, 721 A.2d 241

(1998). "In considering the evidence presented at the suppression hearing, we extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts." *Dedo v. State*, 105 Md.App. 438, 445, 660 A.2d 959 (1995), *rev'd on other grounds*, 343 Md. 2, 680 A.2d 464 (1996). "When the facts are in dispute, deference is paid to the trial court, that is, its findings of fact are accepted unless they are clearly erroneous." *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996). The ultimate, conclusory fact of whether a search was valid, however, is based on our own "independent constitutional appraisal" of the applicable law and the facts of the case. *Jones*, 343 Md. at 457, 682 A.2d 248.

Appellant argues that in denying his motion to suppress the evidence, the trial court erred in finding that the "Prince George's County police 'became' private citizens once they crossed state lines." Appellant further argues that the "mere existence of the Maryland search and seizure warrant did not provide the Prince George's County police with the authority to execute it within the territory of Washington, D.C."

■ The concept that police officers may act as private citizens when outside of their territorial jurisdiction is recognized in Maryland. In the leading case of *Stevenson v. State*, 287 Md. 504, 510, 413 A.2d 1340 (1980), the Court of Appeals stated:

Generally, a peace officer's authority to make an arrest is limited, in the absence of statutory authority expanding it, to the confines of the geographical unit of which he is an officer. At common law, a limited exception to this rule developed which permits an officer who is in "fresh pursuit" of a suspected felon to make a legally binding arrest in a territorial jurisdiction other than the one in which he has been appointed to act, and this ancient doctrine has, to some extent, been codified in this State. *In all other situations, however, a peace officer who makes an arrest while in another jurisdiction does so as a private person, and may only act beyond his bailiwick to the extent that the law of*

*the place of arrest authorizes such individuals to do so.*
[Emphasis added.]

*Stevenson,* 287 Md. at 509, 413 A.2d 1340.

In *Stevenson,* two District of Columbia officers were in plain clothes and an unmarked car when they observed two men running from a bank carrying a bag, in a cloud of gas and red smoke. Familiar with banks' practices of marking stolen money with tear gas and dye, the District of Columbia officers pulled their vehicle alongside the suspects and identified themselves as police officers, without displaying any badge of authority, and directed the suspects to stop. When the suspects failed to stop running, the officers exited their car, and apprehended the suspects on foot. In ruling that the officers were not acting as officials, but were private citizens making a valid citizens' arrest, the court concluded that "the Washington officers did not see the cloud of red smoke or the flight of the petitioners because of their status as officers; they merely observed what every private citizen, close enough to do so, could have perceived." *Stevenson,* 287 Md. at 511, 413 A.2d 1340. *See also Boston v. Baltimore County Police Department,* 357 Md. 393, 744 A.2d 1062 (2000). The suspects in *Stevenson* argued that the officers were not acting as private citizens but that they were acting under the "color of the [ ] office," citing Florida case law. The Court discredited that argument, stating, "Even if this Court were inclined to accept the legal principle announced by the Florida intermediate appellate court, we do not believe the activity challenged here would fall within it." The Court stated "that the phrase 'color of office' applies not to the modus operandi of the arrest, but to whether their official authority was used to gain access to the information which led to the belief that an arrest should be made." *Stevenson,* 287 Md. at 511, 413 A.2d 1340.

■■ Although it is true that officers may, in some instances, act as private citizens in making an arrest outside of their jurisdiction, we agree with appellant that the Prince George's County officers were not acting as private citizens when they towed his Cadillac from the District of Columbia to

Maryland and that the protections of the Fourth Amendment apply to this case.

"The Fourth Amendment does not protect citizens against all searches and seizures by government actors; it affords protection only against those that are unreasonable." *Partee v. State*, 121 Md.App. 237, 249–50, 708 A.2d 1113 (1998). As this Court stated in *Hardy v. State*, 121 Md.App. 345, 354, 709 A.2d 168, 172, *cert. denied*, 351 Md. 5, 715 A.2d 964 (1998):

> The linchpin of the Fourth Amendment is reasonableness. "Reasonableness is determined by balancing 'the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests.'" [Internal citations omitted.]

One of the core protections of the Fourth Amendment is the warrant requirement. There is, however, a lesser expectation of privacy associated with automobiles and, because they are inherently mobile, a warrantless search of a vehicle is permitted under certain circumstances. *Malcolm v. State*, 314 Md. 221, 227, 550 A.2d 670 (1988). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." *Maryland v. Dyson*, 527 U.S. 465, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442 (1999).[3] This exception was derived from *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and has since been referred to as the "Carroll doctrine."

In the present case, we need not decide whether a warrantless search of the Cadillac would have been authorized under the Carroll doctrine. *Compare Humphrey v. State*, 39 Md.App. 484, 492, 386 A.2d 1238, 386 A.2d 1238, *cert. denied*,

---

**3.** The Supreme Court reversed this Court's decision in *Dyson v. State*, 122 Md.App. 413, 421, 712 A.2d 573 (1998), *cert. denied*, 351 Md. 287, 718 A.2d 235 (1998), in which we concluded that, in order to conduct a warrantless search of an automobile, there must be both probable cause and exigency. The Supreme Court, however, held that there is "no separate exigency requirement." *Maryland v. Dyson*, 119 S.Ct. at 2014.

283 Md. 733 (1978).[4] The officers gave deference to appellant's Fourth Amendment rights, and secured a warrant to search the Cadillac. Upon returning to appellant's home with the search warrant, they found the car gone. The officers, armed with a warrant reflecting probable cause to believe that the Cadillac contained evidence of the crime, quickly located the car and made arrangements to tow it to the evidence bay.

Although the trial court found that the events occurred in the "early morning hours," it did not make an express finding regarding the exigency of the circumstances presented. Exigency, however, is a question that we review *de novo* and about which we may make our own independent appraisal. *U.S. v. Grogins*, 163 F.3d 795 (4th Cir.1998) (whether there was an exigency to justify police entry without knocking is reviewed *de novo*), *U.S. v. Anderson*, 154 F.3d 1225 (10th Cir.1998), *cert denied*, 526 U.S. 1159, 119 S.Ct. 2048, 144 L.Ed.2d 215 (1999); *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085 (5th Cir.1997), *cert. denied*, 522 U.S. 1125, 118 S.Ct. 1073, 140 L.Ed.2d 132 (1998); *U.S. v. Howard*, 961 F.2d 1265 (7th Cir.1992), *cert. denied*, 506 U.S. 882, 113 S.Ct. 236, 121 L.Ed.2d 171 (1992). In the present case, the facts surrounding appellant's arrest and the events leading to the search of his Cadillac are not disputed.[5]

A review of the circumstances surrounding appellant's arrest emphasizes the urgency presented. Pursuant to an outstanding arrest warrant, appellant was arrested in Fairfax

---

**4.** In *Humphrey*, this Court found no exigency existed when the suspect was in police custody, the automobile was parked in front of his house, the police had no reason to believe that someone else would move the vehicle, and there was no risk that delay would result in destruction of the evidence. We held that the police were required to secure a search warrant before they could legally search the vehicle.

**5.** At the suppression hearing, appellant argued that the warrant contained clerical errors regarding the location of the vehicle to be searched and that, from the warrant, it appeared that the officers seized the Cadillac prior to obtaining a warrant. In ruling, however, the trial court found that the officers had the warrant prior to seizing the Cadillac.

County, Virginia, while driving his Oldsmobile, at approximately 2:45 p.m. on Friday, February 28. He was then transported to the Mount Vernon Police Station in Alexandria, Virginia, to wait for Prince George's County officers to arrive. By 3:45 p.m., both appellant and his Oldsmobile were being transported back to Maryland, where the police immediately applied for a search warrant for the Oldsmobile. Later that evening, the officers discovered, through computer records, that appellant had a second car, a 1981 Cadillac, registered in his name. Around 9 or 10 p.m., the officers confirmed that appellant's Cadillac was parked outside his residence and typed an affidavit and search warrant application for both the Cadillac and his residence. The warrants were then taken to the judge's house to be signed. Once signed, the officers attempted to execute the warrants at approximately 11:15 p.m. At that time, the officers discovered that the Cadillac, which had been parked in front of appellant's residence only two hours before, was gone. Later that night, appellant's mother informed them that the Cadillac had been relocated to the District of Columbia By 4:10 a.m., the officers located the Cadillac and had the car towed to Maryland to be searched pursuant to the warrant.

In light of the circumstances, we do not believe that it was unreasonable for the officers to tow the car to Maryland before searching it pursuant to the warrant. The fact that the car was no longer in Maryland did not negate probable cause and the officers' belief that the Cadillac contained evidence of the crime that supported the issuance of the warrant. Moreover, the exigency of the circumstances was greatly heightened. While appellant was in custody, the car had been relocated to another jurisdiction by someone other than appellant during the early morning hours. Contrary to *Humphrey*, it would be reasonable to conclude that appellant had someone move the car for him and possibly destroy evidence as well. Further, waiting to secure assistance from the District of Columbia police department would have taken substantial time and possibly would have been at the expense of evidence validly sought to be discovered. See *Soles v. State,* 16 Md.

App. 656, 299 A.2d 502, *cert. granted,* 268 Md. 753, 305 A.2d 242, *cert. dismissed,* October 12, 1973, *cert. denied,* 415 U.S. 950, 94 S.Ct. 1473 (1974).[6]

In the case of *Crowley v. State,* 25 Md.App. 417, 334 A.2d 557 (1975), this Court discussed a somewhat similar circumstance. Saint Mary's County police officers suspected that Crowley would be transporting drugs in his vehicle when he returned from a trip to Kentucky. The officers secured a search warrant for a search of both Crowley and his automo-

---

6. In *Soles,* police officers received a tip at 12:30 a.m. that Soles, a major distributor of narcotics out of New York and connected with a large-scale drug distribution operation in the District of Columbia, was going to make a "midnight run" to New York sometime before 3:00 a.m., carrying several thousand dollars of cash, a pistol, and over an eighth of a kilo of cocaine in a glass jar in a briefcase located in the trunk of his car. Acting on the tip, two District of Columbia police officers were on automobile surveillance waiting for Soles to "make his move" from a residence in northeast Washington, D.C. When Soles left, the officers gave immediate pursuit and stopped him moments after he crossed into Prince George's County, Maryland. The officers, without a warrant, arrested Soles and searched the trunk of the vehicle, including a locked briefcase located in the trunk, finding the suspected items. The court found that the search was valid under the automobile exception to the warrant requirement, finding both probable cause and exigent circumstances existed. In finding exigent circumstances, the trial court relied on testimony from an assistant states attorney, who was consulted before the officers apprehended Soles and authorized the officers to search without a warrant. He also testified that it would have taken two to three hours to secure a search warrant in the District of Columbia in the middle of the night, because the officers would have to drive to headquarters to type up an affidavit, locate the necessary warrant forms from the Superior Court building, ascertain the identity of the "night-time judge" and likely have to travel to the judge's home in order to present the warrant application. The court found that the officers were faced with exigent circumstances, "not only permitting, but demanding immediate action." *Soles,* 16 Md.App. at 668, 299 A.2d 502.

The facts here reflect an exigency similar to that found in *Soles,* and in this case the officer had received a warrant. Maryland police officers, after arresting appellant in Virginia and visually locating the Cadillac parked in front of his residence, secured a Maryland search warrant for the Cadillac, presumably still located at his residence. Upon finding the car missing and learning of its relocation to the District of Columbia, the officers seized the vehicle and towed it to Maryland. Although it was not discussed at the suppression hearing,

bile, and waited for him to return to Maryland. At 3:00 a.m, the officers observed Crowley make a turn at a stop light heading toward the entrance of the Patuxent River Naval Air Station, which was a short distance ahead.

The officers activated their flashing lights and got behind Crowley's vehicle. Crowley stopped next to the sentry station at the main gate of the Air Station, which was on federal property. The officers ordered Crowley and his passengers out of the car, and informed Crowley that they had a search warrant. The officers "patted down" Crowley and the two passengers. The second officer smelled marijuana, looked inside the vehicle when the door was open, and saw a "brick" of marijuana on the back floor of the car. The officer then drove the car off the federal reservation onto the grounds of an adjoining schoolyard with an overhead street light, where the car was subsequently searched pursuant to the warrant; the marijuana and a number of other items were seized from the car. The car was then impounded, locked, and stored in a police impoundment lot. A week later, the car was again searched and a vial of LSD capsules was discovered.

Crowley argued, as does appellant in this case, that the search warrant had no extra-territorial effect, citing the case of *Gattus v. State*, 204 Md. 589, 105 A.2d 661 (1954). We concluded that although the *Gattus v. State* extra-territorial argument was sound, its application to the search in *Crowley* was not proper. To be successful, the *Gattus* argument must be premised on both the search and seizure being executed in a foreign jurisdiction. In *Crowley*, "[n]o seizure was made, however, until the search of the vehicle, in the execution of the warrant, on the school parking lot, under the territorial jurisdiction of the State." *Crowley*, 25 Md.App. at 422, 334 A.2d 557. The Court stated that, notwithstanding what took place on federal land, "it is clear to us from the evidence that the automobile was on land unquestionably within the territorial jurisdiction of the State when it was searched, and when

attempting to secure a District of Columbia warrant would have likely required a similar process as that described in *Soles*.

numerous items of contraband found in that search, including the brick of marijuana, were seized." *Crowley* at 423, 334 A.2d 557.

In the present case, the officers had probable cause not only to arrest appellant, but also to support a search warrant of both his cars and his home. The officers dutifully applied for the search warrant for the Cadillac, believing it would remain parked at his house, as appellant was currently in police custody. In executing the warrant, however, the police learned that the car had been moved to a different location. The officers simply located the vehicle and had it towed back to Maryland to police headquarters to be searched. Similar to *Crowley,* the actual search and the discovery and seizure of the evidence appellant desired to suppress all occurred in Maryland.

At argument, appellant sought to distinguish *Crowley* based on Crowley's arrest and seizure being in the nature of fresh pursuit, as the officers had Crowley in view and followed him onto the Naval Air Station. The search in *Crowley* was upheld because the search was conducted in Maryland and pursuant to a warrant, not based on the concept of fresh pursuit. Recognizing that the fresh pursuit doctrine permits the arrest by an officer of a person in another jurisdiction, rather than the independent seizure of property, the officers' activities in locating and securing this vehicle was similar to the concept of fresh pursuit. See Maryland Code Ann. (1957, 1996 Repl. Vol), §§ 595–602 of Article 57; District of Columbia Code Ann. § 23–901 et seq. (1981).[7] The Prince George's

---

7. The District of Columbia fresh pursuit statute provides, in part:

§ 23–901 Arrests in the District of Columbia by officers of other States.

Any member of a duly organized peace unit of any State (or county or municipality thereof) of the United States who enters the District of Columbia in fresh pursuit and continues within the District of Columbia in fresh pursuit of a person in order to arrest him on the ground that he is believed to have committed a felony in such State shall have the same authority to arrest and hold that person in custody as has any member of any duly organized peace unit of the District of Columbia to arrest and hold in custody a person on the

County officers clearly were actively pursuing a vehicle that had already been moved once in the short time since they first located it, presumably at the direction of appellant, and from which evidence sought to be retrieved was at risk of being destroyed. Granted, it was not a "bumper to bumper, 'fender-smashing Hollywood style chase,'" as described in *Glover v. State*, 88 Md.App. 393, 402, 594 A.2d 1224 (1991) (internal citations omitted), but urgency was nonetheless present.

Although we may not approve of the acts of the Prince George's County police officers in neglecting to consult the District of Columbia police department concerning their intent to tow the vehicle to Maryland, we are not convinced that their actions were in bad faith or unreasonable under the Fourth Amendment and warrant exclusion of the evidence.

## II. Police Presence

Appellant next argues that the trial court erred in refusing to grant a mistrial based on the presence of uniformed police officers at the trial and, again, at sentencing. We disagree.

"It is well established that the decision to grant a motion for a mistrial rests in the discretion of a trial judge and our review is limited to determining whether there has been an abuse of discretion. The question is one of prejudice." *Coffey v. State*, 100 Md.App. 587, 596–7, 642 A.2d 276 (1994) (internal citations omitted). "[T]he trial judge's decision denying a mistrial will not be disturbed on appeal unless there has been a clear showing of prejudice to defendant." *Vandegrift v. State*, 82 Md.App. 617, 635, 573 A.2d 56, *cert. denied*, 320 Md. 801, 580 A.2d 219 (1990).

In the present case, no record was made of the number of spectators at the trial and even the number of police officers present is not clear. Appellant suggested that there were

ground that he is believed to have committed a felony in the District of Columbia. This section shall not be construed so as to make unlawful any arrest in the District of Columbia which would otherwise be lawful.

thirty to forty officers, but the trial court corrected him, noting that there were "over ten." The trial court's statement "we do not have a capacity courtroom" suggests that the courtroom was not filled. There is no showing that the officers sat together or did anything in particular to reflect a show of solidarity or force. The record does not demonstrate appellant was prejudiced and deprived of his right to a fair trial. In fact, during trial, appellant's counsel stated: "Actually, I can't gauge what impact, the risk of the impact on them, on the deliberations of the jurors." No issue was raised as to any possible impact on the witnesses. Considering the evidence against appellant, including his own statements, the fact that the jury found him guilty but did not find him to be a principal in the first degree and therefore ineligible for the death penalty, mitigates against a finding of actual prejudice.

The issue thus becomes whether the presence of the officers "was so inherently prejudicial that respondent was thereby denied his constitutional right to a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). When reviewing a challenge to a courtroom situation based on inherent prejudice, the question is whether "an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 570, 106 S.Ct. 1340 (citing *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)).

The mere presence of uniformed police officers in itself does not appear to be "inherently prejudicial" under *Holbrook*. In *Holbrook*, the defendant argued that the presence of a security force consisting of four uniformed state troopers, two deputy sheriffs, and six committing squad officers, violated his right to a fair trial. Without minimizing "the threat that a roomful of uniformed and armed police might pose to a defendant's chance of receiving a fair trial," the Court found that "the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable," and that "it is entirely possible that jurors will not

infer anything at all from the presence of the guards." *Holbrook*, 475 U.S. at 569, 106 S.Ct. 1340.

Appellant cites the case of *Woods v. Dugger*, 923 F.2d 1454 (1991) as support for his position. In *Woods*, the U.S. Court of Appeals from the Eleventh Circuit found that the defendant was deprived of his right to a fair trial based on the hostile atmosphere of the community and the number of uniformed prison guards present at trial. The defendant there was on trial for the murder of a prison guard. The trial took place in a small rural county in northern Florida with a population of 10,000 people, one third being prisoners. There were also four prisons in two adjacent counties. The prison system employed 2200 workers in the area and contributed over $71 million dollars to the local economy. Prior to his murder, the victim, interviewed by the local newspaper, stated that the prison was dangerously understaffed and that he feared for his safety as a prison guard. The guard's death became a catalyst for lobbying efforts for increased staffing for the institution and created significant pretrial publicity. Further, seven of the jurors either had previously been employed by the prison system or had relatives who currently worked in the prison system. A videotape of the trial demonstrated that the courtroom was inundated with spectators, half of whom were uniformed prison personnel. The *Woods* court found that the defendant was prejudiced, stating: "[T]he record demonstrates that the pretrial publicity combined with the large number of uniformed spectators rose to the level of inherent prejudice, thereby depriving the petitioner of a fair trial." *Woods*, 923 F.2d at 1460.

The present case is quite different from the situation in *Woods*. Although appellant was on trial for the murder of a police officer, the trial was held in Prince George's County, which is part of the Washington D.C. metropolitan area, and not a rural area. There is no showing of unusual pretrial publicity, special community economic circumstances, or any particular relationship between police officers generally and the population from which the jury was selected. The victim was not a Prince George's county officer, but was a member of

the District of Colombia police force. The fact that police officers were interested in the case should not have been surprising or particularly prejudicial in itself. *See Pratt v. State,* 228 Ga.App. 567, 492 S.E.2d 310 (1997)(presence of twenty-five uniformed correctional officers after close of evidence but prior to jury instructions did not create inherent prejudice depriving defendant of a fair trial). There is no evidence of disruption or any intimidation of the witnesses or jurors or that the officers' location in the courtroom constituted an unusual show of force. *See Howard v. State,* 941 S.W.2d 102 (Tex.Crim.App.1996)(absent a showing of overt conduct or expression, the presence of twenty uniformed peace officers did not deprive defendant of a fair trial).

It is fundamental that criminal proceedings are presumptively public. Exclusion of the public from the courtroom is an "extreme remedy" and is proper "only in limited and unusual circumstances" where it has been demonstrated that the value of closure far outweighs the value of keeping the courtroom open. *Baltimore Sun Co. v. Colbert,* 323 Md. 290, 300, 593 A.2d 224 (1991) (quoting *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 509, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).

Appellant has failed to demonstrate that the presence of an unknown number of uniformed police officers at trial created an unacceptable risk of impermissible factors coming into play and was so inherently prejudicial that appellant was denied a fair trial. Therefore, we do not believe the trial court erred in refusing to exclude a "sizable portion" of the unknown number of officers present at trial and we find no abuse of discretion error in the trial court's refusal to grant a mistrial.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**